UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ZUBIN KHAVARIAN,<br><br>                                   Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN, Acting Commissioner of Social Security,<br><br>                                   Defendant. | Case No.:  16cv1251-JLS (BLM)<br><br>**REPORT AND RECOMMENDATION FOR ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>**[ECF No. 12, 14]** |

Plaintiff Zubin Khavarian brought this action for judicial review of the Social Security Commissioner's ("Commissioner") denial of his claim for disability insurance benefits.  ECF No. 1. Before the Court are Plaintiff's Motion for Summary Judgment [ECF No. 12-1 ("Pl.'s Mot.")], Defendant's Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment [ECF Nos. 14-1 and 15-1[1] ("Def.'s Mot.")], and Plaintiff's Reply in Support of his Motion for Summary Judgment and an Opposition to Defendant's Cross-Motion for Summary Judgment [ECF No. 18 ("Pl.'s Reply")].

This Report and Recommendation is submitted to United States District Judge Janis L.

---

[1]  Defendant's Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment appear on the Docket as two documents, numbers 14 and 15.  The contents of the documents are the same so, for clarity, the Court will refer to Defendant's cross-motion and opposition as one document, namely, "Def.'s Mot." and will cite to ECF No. 14-1.

1

Sammartino pursuant to 28 U.S.C. § 636(b) and Local Civil Rule 72.1(c) of the United States District Court for the Southern District of California. For the reasons set forth below, this Court **RECOMMENDS** that Plaintiff's Motion for Summary Judgment be **GRANTED** and Defendant's Cross-Motion for Summary Judgment be **DENIED**.

## PROCEDURAL BACKGROUND

On April 3, 2014, Plaintiff filed a Title II application for a period of disability and disability insurance benefits, alleging disability beginning on August 1, 2012. See Administrative Record ("AR") at 147–50. The claim was denied initially on June 27, 2014, and upon reconsideration on October 2, 2014, resulting in Plaintiff's request for an administrative hearing. Id. at 109–13, 115–19, 120–21.

On October 7, 2015, a hearing was held before Administrative Law Judge ("ALJ") James S. Carletti. Id. at 44–81. Plaintiff and an impartial vocational expert ("VE"), Nelly Katsell, testified at the hearing, and an impartial medical expert, Robert J. McDevitt, M.D., testified telephonically. See id. In a written decision dated November 9, 2015, ALJ Carletti determined that Plaintiff has not been under a disability, as defined in the Social Security Act, from August 1, 2012, through the date of the ALJ's decision. Id. at 29, 38. Plaintiff requested review by the Appeals Council. Id. at 24, 262–64. In an order dated March 28, 2016, the Appeals Council denied review of the ALJ's ruling, and the ALJ's decision therefore became the final decision of the Commissioner. Id. at 1–6.

On May 25, 2016, Plaintiff filed the instant action seeking judicial review by the federal district court. See ECF No. 1. On September 27, 2016, Plaintiff filed a motion for summary judgment alleging the following errors: (1) the ALJ failed to adequately consider the Department of Veterans Affairs ("VA") disability ratings and (2) the ALJ's decision is not supported by

16cv1251-JLS (BLM)

substantial evidence and contains legal errors.  <u>See</u> Pl.'s Mot. at 1–12.  Plaintiff asks the Court

to reverse the final decision of the Commissioner and remand the case for payment of benefits

or, alternatively, remand the case to the Social Security Administration for further proceedings.

<u>Id.</u> at 12.  On October 26, 2016, Defendant filed a timely cross-motion for summary judgment

asserting that the ALJ properly addressed VA disability ratings and "weighed the medical

evidence and medical opinions, and his analysis was supported by substantial evidence."  Def.'s

Mot. at 6–16.  On November 29, 2016, Plaintiff timely filed a reply in support of his motion for

summary judgment and an opposition to Defendant's cross-motion for summary judgment.  Pl.'s

Reply.  Defendant did not file a reply.  <u>See</u> Docket.

## **<u>DISABILITY HEARING</u>**

On October 7, 2015, Plaintiff, who was not represented by counsel, appeared at the

hearing before the ALJ.  <u>See</u> AR at 44–81.  Plaintiff was thirty-six years old at the time of the

ALJ's hearing.  <u>See</u> <u>id.</u> at 52.  During the hearing, the ALJ noted that Plaintiff was alleging

disability as of August 1, 2012, in light of the following conditions: PTSD, asthma, ADD, and a

chronic left ankle tendonitis.  <u>Id.</u> at 46.  The ALJ asked Plaintiff whether he considered obtaining

legal representation, and Plaintiff stated that he met with several attorneys, did not "feel

comfortable" with all but one attorney, but later changed his mind after the attorney that he

considered retaining informed him that either he or his partner would represent Plaintiff during

the administrative hearing.  <u>Id.</u> at 47–49.  Plaintiff stated that no one would "take the time to

know [his] situation as well as [he] know[s] it," and that he "ha[s] so much anxiety over the

whole process."  <u>Id.</u> at 49–50.

The ALJ then questioned Plaintiff regarding his work experience and alleged disability.

<u>Id.</u> at 52–60.  Plaintiff testified that he has a college degree, and that for the past seventeen

3

years he had worked for the U.S. Air Force, initially as a "radar technician," and as a "weather officer" for the ten years prior to his alleged onset of disability. Id. at 52–53, 56. Plaintiff stated that he stopped working due to medical retirement and that the VA determined him to be "[h]undred percent [disabled] with homebound."[2] Id. at 53–54. Plaintiff testified that his treating psychiatrist, Dr. Lane, used to work for the VA, but left for private practice, that he has been seeing Dr. Lane for at least two and a half years, and that he sees Dr. Lane every three to six weeks "depending on the situation." Id. at 55. He stated that he was granted only "10 visits per year to see a psychiatrist," and thus has to use the appointments "judiciously." Id. at 63, 65. Plaintiff also stated that he gets most of his treatments at the VA, but that it is "too daunting and too hard to get follow-up care" through the VA. Id. at 54.

Plaintiff stated that his PTSD was caused by several factors and testified as follows:

> we were transitioning from our area of operations into Afghanistan. And my boss —decided to purposefully delay our providing support[,] kind of like to punish her superiors for not including her in the planning process. Also she wasn't coming to work and not taking leave. And so[,] being the only other officer[,] people were coming to me an[d] complaining. So eventually I went and talked to our boss. And long story short[,] I faced about two years of like basically daily reprisals.

Id. at 56. Plaintiff stated that the "reprisals" from his boss were difficult because they negatively impacted his career, and because he was assigned to work full-time as a "technical expert" in the operations center, where he observed "live combat video and fires—we operated a combat airplane remotely." Id. at 57. Plaintiff explained that he was "engaging in live combat with the enemy. Oftentimes it was fratricide, literally our troops being killed in live video by our

---

[2] Plaintiff explained that the "homebound" qualification applies when a person's "total disabilities equal something like 160 percent . . . . It's either 130 or 160." Id. at 53.

4

munitions.  Instances I was involved where I had to call off weapons fire on children."  <u>Id.</u> at

69.  Plaintiff stated that he was greatly impacted by "some of the scenes that [he] took part in."

<u>Id.</u> at 57.

Plaintiff testified that he was prescribed Zoloft, Prazosin, and Adderall, and that his

doctors increased the doses of some of his prescription medications over a year ago.  <u>Id.</u> at 57–

58.  He stated that the medications "usually help," and that although he experiences some side

effects from the medications, those side effects are "nothing compared to what it would be like

if [he] didn't take [the medications]."  <u>Id.</u> at 54–55.

Plaintiff stated that he "has a hard time sleeping," has nightmares at least six times a

week, sleeps five to six hours on a "good day," and only three hours of sleep on a regular day.

<u>Id.</u> at 59, 63.  He also testified that he is unable to "just trust people in general," has trouble

completing tasks, gets overwhelmed easily, and tends to put things off for as long as he can.

<u>Id.</u> at 59, 71.  Plaintiff claimed that his tolerance level is down, that he sees one friend on a

relatively regular basis, and two other acquaintances approximately twice a year.  <u>Id.</u> at 59.  He

also stated that he sees his mother every four to six weeks and calls her once a week.  <u>Id.</u> at

60.

Plaintiff testified that he lives by himself, does laundry, buys groceries, drives three times

a week, but prefers to avoid people.  <u>Id.</u> at 60, 64.  He further stated that most of the time, he

stays at home, watches TV, reads, eats "pre-prepared meals," and very rarely cooks.  <u>Id.</u>

Plaintiff also stated that he had not had any psychological treatment because "[i]t's

difficult to talk about.  And a lot of the treatment that's been offered [has] been in a group

setting.  And the last thing I want to do . . . is be around other military people talking about

their issues.  <u>Id.</u> at 65.  Plaintiff stated that being around civilians would be better for him, that

the VA allowed him to see a civilian psychiatric provider in the past, but only because it "was running [] behind on getting appointments on the military side," and that he has to see military physicians for all of his "issues." Id. Plaintiff stated that "unless I absolutely have to go, I'd rather not go. I don't want to go on base. I don't want to be sitting around uniforms. I don't want to be talking to a military doctor." Id.

With respect to his asthma, Plaintiff testified that "[g]enerally [it is] not too bad," and is "generally controlled." Id. at 55–56. He further testified that if he gets sick, it "takes [him] a long time to recover," and when he is stressed or exercises, he has trouble breathing. Id. at 55.

Dr. McDevitt, a psychological expert, appeared telephonically at Plaintiff's administrative hearing. Id. at 44–45, 61–73. Dr. McDevitt initially stated that "the last exhibit [he] ha[s] is 9F," but later noted that "there's something here. If you'll give me a few minutes I've got this one that's confused. I thought it was 11:45 but I do have it." Id. at 61. He then asked the ALJ whether it "would be okay if [he] reviewed it." Id. at 62. The ALJ gave Dr. McDevitt five to ten minutes to review the records during the break. Id. After the break, Dr. McDevitt stated that he has reviewed exhibits 1 through 16F. Id.

Dr. McDevitt testified that Plaintiff had a history of PTSD, which was treated by "appropriate" medications, but noted that the doses of the medications were "somewhat lower" than ordinarily prescribed. Id. at 66–67. He stated that Plaintiff's asthma appeared to be under control. Id. at 67. Dr. McDevitt further stated that Plaintiff was diagnosed with ADHD, although he was not sure what the bases for the diagnosis were. Id. Dr. McDevitt also testified that he was in "total agreement with Dr. Glassman that the subjective symptoms that [Plaintiff was] talking about would preclude ability to work." Id. However, Dr. McDevitt noted that he was

16cv1251-JLS (BLM)

"troubled that [Plaintiff had] not made any effort to do anything except take medication and not do . . . any active work during the day."  Id.  He also stated that although he agreed with Plaintiff's PTSD diagnosis, he did not find "any solid evidence for the B criteria" in the record, because Plaintiff "had no difficulty in caring for himself," had "moderate social issues," and did not have conflicts with anyone.  Id.

Dr. McDevitt noted that although Plaintiff "may have difficulty working during the day at times" because of difficulties with sleep, there was no "documented evidence that Plaintiff ha[d] more than moderate difficulty in concentration and persistence and pace."  Id. at 68.  Dr. McDevitt acknowledged that Dr. Lane, Plaintiff's attending physician, and Dr. Glassman opined that Plaintiff might have "difficulty in completing a normal work week," that Plaintiff "has no usefulness in his military work, [and is] not able to be deployed, especially in worldwide deployment."  See id.; see also id. at 70.  Dr. McDevitt also acknowledged that Plaintiff might be drowsy or miss work.  Id. at 69.  But Dr. McDevitt also stated that he did not see any evidence indicating that Plaintiff could not do simple work outside of the military, and that Plaintiff's trauma was "very unusual" because Plaintiff was "traumatized by watching videos of combat." Id. at 70.  Dr. McDevitt noted that Plaintiff had not displayed any progress during his treatment in 2011–13, which he found concerning.  Id. at 68.  Dr. McDevitt opined that Plaintiff "certainly meets the VA's criteria," but that he "can't see enough in th[e] record to meet the Social Security disability standards," because Plaintiff was able to do simple repetitive work in a non-public environment.  Id. at 69.

At the end of his administrative hearing, Plaintiff objected to Dr. McDevitt's telephonic appearance on the grounds that he did not have an advanced notice that the appearance would be telephonic and because Dr. McDevitt had not reviewed Plaintiff's records prior to the day of

the hearing.  Id. at 78.  The ALJ responded that Plaintiff's objection was noted and was "on the record."  Id.  He further stated that all doctors appear telephonically at administrative hearings, but acknowledged that the notice of the hearing sent to Plaintiff "did not say [that the medical expert was] going to appear telephonically."  Id. at 79–80.  The ALJ further stated that if Plaintiff objected to a medical expert appearing telephonically, "then there'd be no medical expert."  Id. at 80.

Additionally, Ms. Katsell, a VE, testified at Plaintiff's administrative hearing.  Id. at 73–77. She classified Plaintiff's past relevant work as a "meteorological technician," Dictionary of Occupational Titles ("DOT") 025.267-014, light, with and SVP 6, and "Avionics and radar technician," DOT 823.261-026, light, SVP 6.  Id. at 73–74.  Ms. Katsell opined that a hypothetical person of Plaintiff's age, education, and work experience, with no significant physical limitations, but with emotional or psychiatric conditions that limit such person to simple, repetitive tasks in a non-public work environment, and to minimal interaction with co-workers and supervisors, could not perform Plaintiff's past work.  Id. at 74.  She opined that such person would be able to perform the following jobs: "hand packager," DOT 020.587-018, medium, non-public, SVP 2, with 220,000 jobs nationally; "garment sorter," DOT 222.687-014, light, non-public, SVP 2, with 255,000 jobs nationally; and "document preparer," DOT 249.587-018, non-public, SVP 2, with 190,000 jobs nationally.  Id. at 74–75.  Ms. Katsell also testified that the above jobs require the ability to work 40 hours per week, and typically allow two 15-minute and a half an hour lunch break per workday.  Id. at 75.  She further stated that to maintain such jobs, a person could miss maximum two days per month.  Id.

The ALJ then posed the following hypothetical question, which the VE answered as follows:

16cv1251-JLS (BLM)

Q     [w]ith the same vocational profile as the claimant and if the limitations were those that he's testified to.  Difficulty with sleep, resulting fatigue because of nightmares.  Irritability.  Difficulty with concentration.  Sense of being overwhelmed.  And difficulty staying on a consistent basis.  Would that person be able to sustain any of these jobs you've identified or any other positions?

A     No, your honor.

Id. at 75–76.  Plaintiff then asked the VE whether a person who is unable to accept instructions and respond appropriately to criticism from supervisors would be able to "meet performance standards for continued employment that would be customarily accepted in that field," and the VE answered that such person would not.  Id. at 76–77.

## ALJ's DECISION

On November 9, 2015, the ALJ issued a written decision in which he determined that Plaintiff was not disabled as defined in the Social Security Act.  Id. at 28–38.  Initially, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since his alleged disability onset date of August 1, 2012.  Id. at 30.  He then considered all of Plaintiff's medical impairments and determined that the following impairments were "severe" as defined in the Regulations: "posttraumatic stress disorder with associated ADHD and sleep issues."  Id.  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Id. at 31.  The ALJ concluded that Plaintiff's residual functional capacity ("RFC") permitted him to "perform a full range of work at all exertional levels but with the following nonexertional limitations: non-public simple repetitive tasks."  Id. at 32.  The ALJ then found that Plaintiff could not perform his past relevant work as a "meteorological technician" and "radar technician," but could perform other work existing in significant numbers in the national economy, including a "hand packager" and a "garment sorter."  Id. at 36–37.

9

**STANDARD OF REVIEW**

Section 405(g) of the Social Security Act permits unsuccessful applicants to seek judicial review of the Commissioner's final decision. 42 U.S.C. § 405(g). The scope of judicial review is limited in that a denial of benefits will not be disturbed if it is supported by substantial evidence and contains no legal error. Id.; see also Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1193 (9th Cir. 2004).

Substantial evidence is "more than a mere scintilla, but may be less than a preponderance." Lewis v. Apfel, 236 F.3d 503, 509 (9th Cir. 2001) (citation omitted). It is "relevant evidence that, considering the entire record, a reasonable person might accept as adequate to support a conclusion." Id. (citation omitted); see also Howard ex rel. Wolff v. Barnhart, 341 F.3d 1006, 1011 (9th Cir. 2003). "In determining whether the [ALJ's] findings are supported by substantial evidence, [the court] must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the [ALJ's] conclusion." Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998) (citations omitted). Where the evidence can reasonably be construed to support more than one rational interpretation, the court must uphold the ALJ's decision. See Batson, 359 F.3d at 1193. This includes deferring to the ALJ's credibility determinations and resolutions of evidentiary conflicts. See Lewis, 236 F.3d at 509.

Even if the reviewing court finds that substantial evidence supports the ALJ's conclusions, the court must set aside the decision if the ALJ failed to apply the proper legal standards in weighing the evidence and reaching his or her decision. See Batson, 359 F.3d at 1193. Section 405(g) permits a court to enter judgment affirming, modifying, or reversing the Commissioner's decision. 42 U.S.C. § 405(g). The reviewing court may also remand the matter to the Social

Security Administration for further proceedings.  Id.

**DISCUSSION**

**I.   The ALJ Did not Give Proper Weight to Plaintiff's Disability Rating as Determined by the VA**

Plaintiff argues that the ALJ erred by assigning little weight to the VA's finding that Plaintiff is 100% disabled.  See Pl.'s Mot. at 1–4; Pl.'s Reply at 1–7.  Plaintiff asserts that the ALJ neither cited specific evidence supporting his conclusion, nor mentioned any aspects of the VA's evaluation other than the percentage of disability awarded.  Pl.'s Mot. at 3.  Plaintiff further claims that the ALJ did not address the VA's finding that "[Plaintiff] is unable to secure or maintain substantially gainful employment due to PTSD" and that Plaintiff met the "housebound" classification criteria.  Id.  Finally, Plaintiff maintains that Defendant cannot advance a post-hoc rationale in arguing that the ALJ departed from the VA's findings because the ALJ considered evidence that was not available to the VA.  Pl.'s Reply at 5–6.

Defendant maintains that the ALJ provided persuasive, specific and valid reasons for discounting the VA's disability ratings.  Def.'s Mot. at 6–8.  In support, Defendant asserts that the ALJ stated that the objective evidence did not support a finding of disabled under the SSA criteria and that Plaintiff's mental restrictions did not prevent him from performing work in light of his RFC.  Id. at 7.  Defendant also contends that the ALJ properly considered evidence that "came into existence after the VA issued its report," including Dr. Lane's treatment notes and Mental Residual Functional Capacity Assessment form, and Dr. McDevitt's testimony.[3]  Id.

_____

[3]   Non-examining, non-treating physician, Dr. McDevitt, testified at Plaintiff's administrative hearing that Plaintiff "certainly meets the VA's criteria," but further noted that he could not "see enough in th[e] record to meet the Social Security disability standards."  AR at 69.

11

### 1. Plaintiff's VA Records

Effective May 6, 2014, the VA determined that Plaintiff was 100% disabled.  AR at 442–49.  Specifically, the VA found that Plaintiff had a disability rating of 100% for PTSD with ADD, 30% for asthma, 20% for lumbar myofascial strain, 10% each for left and right posterior tibial tendonitis, and 10% each for left and right patellofemoral syndrome.  <u>Id.</u> at 442–43.  The VA further determined that Plaintiff met the criteria for the "housebound" status.  <u>Id.</u> at 443, 445.  The VA noted that the 100% rating for PTSD, which was increased from 30% assessed earlier, was based on Plaintiff's difficulty in adapting to work and to stressful circumstances; near-continuous depression affecting the ability to function independently, appropriately and effectively; difficulty in adapting to a work-like setting; occupational and social impairment, with difficulties in most areas, such as work, school, family relationships, judgment, thinking, or mood; disturbances of motivation and mood; inability/difficulty in establishing and maintaining effective work and social relationships; panic attacks more than once a week; forgetting directions, recent events, and names; depressed mood; mild memory loss; chronic sleep impartment; anxiety; and suspiciousness.  <u>Id.</u> at 444.   The VA also found that Plaintiff was "unable to secure or maintain substantially gainful employment due to PTSD," and noted that "[t]his is the highest schedular evaluation allowed under the law for this condition."  <u>Id.</u>  Additionally, the VA stated that the finding of 30% disability rating for asthma was based on Plaintiff's daily oral bronchodilator therapy and inhalational anti-inflammatory medication.  <u>Id.</u>

### 2. Relevant Law

"[A]lthough a VA rating of disability does not necessarily compel the SSA to reach an identical result, 20 C.F.R. § 404.1504, the ALJ must consider the VA's finding in reaching his decision."  <u>McCartey v. Massanari</u>, 298 F.3d 1072, 1076 (9th Cir. 2002).  When considering a VA

determination of disability, the ALJ must give great weight to the decision because "of the marked similarity between these two federal disability programs." Id. Specifically,

> [b]oth programs evaluate a claimant's ability to perform full-time work in the national economy on a sustained and continuing basis; both focus on analyzing a claimant's functional limitations; and both require claimants to present extensive medical documentation in support of their claims. . . . Both programs have a detailed regulatory scheme that promotes consistency in adjudication of claims. Both are administered by the federal government, and they share a common incentive to weed out meritless claims.

Id. However, because the VA and SSA criteria for determining disability are not identical, "the ALJ may give less weight to a VA disability rating if he gives persuasive, specific, valid reasons for doing so that are supported by the record." Id.

### 3. Analysis

The VA found that Plaintiff is 100% disabled and "unable to secure or maintain substantially gainful employment due to PTSD." AR at 444. The ALJ assigned "less weight" to the above disability rating by the VA. Id. at 34. The ALJ cited McCartey, 298 F.3d at 1076, and stated that "[b]ecause the VA and SSA criteria for determining disability are not identical," an ALJ is allowed to give less weight to a VA disability rating "if he gives persuasive, specific, valid reasons for doing so that are supported by the record." Id. The ALJ reasoned as follows:

> [h]ere, as discussed above, the objective evidence does not support a finding of disabled under the criteria set forth by the Social Security Administration. While the claimant is certainly limited in his work capacity and precluded from his prior occupations, his mental restrictions do not preclude him from performing work at a residual functional capacity adopted herein.

Id. at 35.

Although the ALJ did mention the VA's disability rating, he did not provide persuasive, specific, and valid reasons supported by the record for assigning "less weight" to the rating. To the extent the ALJ asserts that he assigned less weight to the VA disability rating because the

13

criteria used by the VA is not the same as the one used by the Social Security Administration, this is not a valid reason to discount the VA's disability rating. See id. at 34; Underhill v. Berryhill, —F. App'x—, 2017 WL 1101098, at *1 (9th Cir. 2017) (concluding that the fact that the rating system used by the VA is not the same as the system used by the Social Security Administration, is not a valid reason to discount the VA's disability rating); Berry v. Astrue, 622 F.3d 1228, 1236 (9th Cir. 2010) (concluding that the fact that the SSA is not bound by the VA's determination because the governing rules differ is not a "persuasive, specific, valid reason[ ]" for discounting the VA determination). The ALJ's other stated reason that "the objective evidence does not support a finding of disabled" because Plaintiff's "mental restrictions do not preclude him from performing work at a residual functional capacity adopted herein," lacks any specifics or explanation, and therefore is not "persuasive, specific, valid reason" for discounting the VA's disability rating. See AR at 35; see also Clark v. Colvin, 2016 WL 4238515, at *5 (W.D. Wash. Aug. 11, 2016) (finding that the ALJ failed to provide persuasive, specific, or valid reasons to give little weight to the VA disability rating, where the ALJ rejected the VA disability rating as inconsistent with the ALJ's determination that plaintiff's PTSD was not severe; reasoning that "the ALJ did not cite to any medical evidence and only made a general reference to 'reasons discussed above'"); Geiger v. Colvin, 2014 WL 1328511, at *5 (W.D. Wash. Mar. 31, 2014) (rejecting the ALJ's assignment of "limited weight" to the VA's disability rating as "not well supported by the record in light of plaintiff's achievements in graduate school and his social activities"; reasoning that "the evidence overall concerning those achievements and activities indicates plaintiff may be far more limited than the ALJ found."). Similarly, the ALJ's statement that Plaintiff's "mental restrictions do not preclude him from performing work at a residual functional capacity adopted herein" lacks the specificity and persuasiveness required by the

Ninth Circuit, especially since the ALJ is reducing a 100% disability with housebound status to an ability to work. See Shotwell v. Astrue, 2011 WL 3348099, at *3 (D. Ariz. Aug. 3, 2011) ("cursory dismissals of VA evidence are explicitly forbidden by the Ninth Circuit, which requires reversal for such errors."). The persuasiveness and validity of the ALJ's decision is further undermined by the opinion of Plaintiff's treating physician, Dr. Lane, who agreed with the VA's finding that Plaintiff is 100% disabled due to PTSD, and also found that Plaintiff meets medical Listing 12.06 for anxiety-related disorders. Id. at 473, 519. As discussed in detail below, Dr. Lane's opinion was supported by his treatment notes, Plaintiff's subjective complaints, and reports from other medical providers who examined Plaintiff.

Defendant also argues that the ALJ properly discounted the VA's disability rating because the ALJ considered evidence that "came into existence after the VA issued its report." Def.'s Mot. at 7–8 (citing Valentine v. Astrue, 574 F.3d 685, 695 (9th Cir. 2009)); see also AR at 28–38. This rationale was not provided by the ALJ. See AR at 28–38. Although a reviewing court may draw specific and legitimate inferences from an ALJ's decision, it cannot speculate regarding the ALJ's reasoning or make "post hoc rationalizations that attempt to intuit what the adjudicator may have been thinking." Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1225–26 (9th Cir. 2009) (stating that "[l]ong-standing principles of administrative law require us to review the ALJ's decision based on the reasoning and factual findings offered by the ALJ—not *post hoc* rationalizations that attempt to intuit what the adjudicator may have been thinking"); Molina v. Astrue, 674 F.3d 1104, 1121 (9th Cir. 2012) ("we may not uphold an agency's decision on a ground not actually relied on by the agency"). Accordingly, Defendant's post hoc rationalizations fail to remedy the ALJ's legal error in failing to articulate persuasive, specific, valid reasons for rejecting the VA disability ratings. See Pohlmann v. Colvin, 2017 WL 2123853, at *9 (S.D. Cal.

May 12, 2017) (finding that "the Commissioner's post hoc rationalizations d[id] not remedy the ALJ's legal error in failing to articulate persuasive, specific, valid reasons for rejecting the VA disability ratings.").

For the reasons stated above and based on the record as a whole, the Court concludes that the ALJ did not provide persuasive, specific and valid reasons for giving less weight to the VA's 100% disability rating, and thereby committed a legal error. See Taylor v. Colvin, 196 F. Supp. 3d 1120, 1127 (N.D. Cal. Jul. 25, 2016) (finding that the ALJ erred by affording "little weight" to the VA's determination that plaintiff was 100% disabled and housebound due to PTSD, where the ALJ did not provide a persuasive, specific, and valid reason supported by the record for discounting the VA's determination); Hanes v. Colvin, 2015 WL 5177763, at *3 (S.D. Cal. Mar. 16, 2015) (finding that the ALJ erred in failing to consider the VA's disability rating of 100% for plaintiff's PTSD, where the ALJ did not articulate specific and legitimate reasons for rejecting the rating).

The Court further finds that the error is not harmless. Harmless error occurs if the error is "inconsequential to the ultimate nondisability determination." See Robbins v. Soc. Sec. Admin., 466 F.3d 880, 885 (9th Cir. 2006); see also Stout v. Comm'r of Soc. Sec. Admin., 454 F.3d 1050, 1055–56 (9th Cir. 2006). Errors that do not affect the ultimate result are harmless. See Parra v. Astrue, 481 F.3d 742, 747 (9th Cir. 2007). "[A] reviewing court cannot consider [an] error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination." Marsh v. Colvin, 792 F.3d 1170, 1173 (9th Cir. 2015) (citing Stout, 454 F.3d at 1055–56). Here, had the ALJ fully credited the 100% disability rating by the VA, Plaintiff's RFC would have differed significantly, and the ALJ would likely have found that Plaintiff is disabled. See Dodson v. Colvin,

2015 WL 5730568, at *6 (W.D. Wash. Sept. 30, 2015) (concluding that "had the ALJ credited fully the 100% disability determination rating by the VA, plaintiff's RFC would have been different and he likely would have been found disabled.").  The Court thus cannot "confidently conclude that no reasonable ALJ . . . could have reached a different disability determination."  See Marsh, 792 F.3d 1170; Stout, 454 F.3d at 1055–56.

The Court finds that the ALJ erred by assigning less weight to the VA's determination that Plaintiff was 100% disabled and that the error was not harmless. The Court therefore **RECOMMENDS** that Defendant's Cross-Motion for Summary Judgment on Issue I be **DENIED**, and Plaintiff's Motion for Summary Judgment be **GRANTED**.

## II.     Substantial Evidence did not Support the ALJ's Decision and ALJ Committed Legal Errors

Plaintiff contends that the ALJ's decision is not supported by substantial evidence and contains legal errors.  See Pl.'s Mot at 1-12.  In support, Plaintiff asserts that the ALJ improperly disregarded the opinions of his treating physician, assigned reduced weight to GAF scores, found Plaintiff not fully credible, and failed to answer Plaintiff's objections during the administrative hearing.  See id.

### A.     Treating Physician's Opinion

Plaintiff contends that the ALJ erred by relying on the medical opinion of a non-treating, non-examining physician, Dr. McDevitt, and overlooking the contrary opinion of Plaintiff's treating physician, Dr. Lane.  See id. at 9; Pl.'s Reply at 7–14.  Defendant responds that the ALJ set forth valid reasons for discounting Dr. Lane's opinion.  Def.'s Mot. at 9–12.

Dr. Lane, Plaintiff's treating psychiatrist, opined that Plaintiff had significant mental impartments, which met the Social Security Listing 12.06 for anxiety-related disorders, and that

17

"due to [Plaintiff's] severe combat related PTSD, [Plaintiff] is prone to [illegible] exacerbations of his PTSD symptoms, especially at night, which would limit his ability to function in a work capacity, on the days following these exacerbations."  AR at 458–60, 519–20.  Dr. McDevitt, a non-examining, non-treating physician, stated that he did not "see enough in th[e] record to meet the Social Security disability standards" and opined that Plaintiff was not precluded from non-public simple work.  Id. at 69.

### 1.  Plaintiff's Medical Records

The medical records most relevant to the issue come from Drs. Lane, Glassman and Morris.

### Dr. Lane

The records establish that Dr. Lane has been Plaintiff's treating psychiatrist since March 17, 2012 until at least September 2015, and diagnosed Plaintiff with chronic PTSD and ADD.  See id. at 186, 377–80, 382–83, 461–63, 465, 473–75, 477, 480, 482–84, 515–17.  Dr. Lane prescribed Zoloft, Prazosin, and Adderall, and consistently noted that Plaintiff was compliant with medications, but showed minimal improvement.  Id. at 379–83, 463–64, 466–67, 470–72, 474–75, 479, 482–84, 515–17.

Dr. Lane's May 3, 2014 notes state that Plaintiff presented with anxiety, depressed mood, difficulty concentrating, falling and staying asleep, excessive worry, fatigue, racing thoughts, and restlessness.  Id. at 377.  He stated that Plaintiff's anxiety was aggravated by conflict or stress, lack of sleep, traumatic memories, and social interactions, and that Plaintiff had weekly panic attacks, "impaired judgment at times," and memory impairment.  Id.  Dr. Lane further noted "no improvement since sept 30, 2012, as evidenced from rx being doubled in june 2013,"

and "no improvement since june 2013 when [Plaintiff's] rx was doubled, as noted in the low GAF score cc meds at this pt due to side effects at higher dosages." Id.

On May 24, 2014, Dr. Lane stated that Plaintiff had "severe chronic ptsd impacting functioning severely during symptoms flare-ups." Id. at 380. On October 25, 2014, he noted "ongoing struggles with hypervigilance, reliving, reexperiencing [symptoms] of past traumas (military trauma)." Id. at 479. Dr. Lane stated that although Plaintiff was managing his symptoms with medications, Plaintiff reported that the symptoms were "still very debilitating," and that on "many days . . . he is impacted by his ptsd [symptoms] to where it makes it difficult to leave the house at times, due to the hypervigilance." Id.

Dr. Lane's January 17, 2015 notes state that Plaintiff had "ongoing severe hypervigilance, reliving and nightmares," and that "[P]razosin helps a bit." Id. at 476. On May 22, 2015, he noted that Plaintiff's "condition has remained the same since 5/14," Plaintiff was compliant with his care, and that if Plaintiff "remains on [Zoloft, Prazosin, and Adderall], he is likely to remain stable for years to come (stable as in his present condition)." Id. at 473, 475. Dr. Lane further stated that he had "reviewed the VA findings granting 100% for ptsd effective 5/14, and agree[d] with the findings, as they were written," and that the findings "still apply today." Id. at 473.

On June 18, 2015, Dr. Lane authored a document entitled "Examination Report, Temporary Disability Retirement List Periodic Examination." Id. at 468. He stated that Plaintiff has chronic PTSD and ADD, which were diagnosed in 2011. Id. Dr. Lane also stated that he had "reviewed the VA findings granting 100% for ptsd effective 5/14, and agree[d] with the findings, as they were written, and they still apply today." Id. He also noted "[t]otal occupational and social impairment due to intermittent inability to perform activities of daily

living." Id. Under PTSD symptoms, Dr. Lane listed "panic attacks, sleep disturbance, avoidance of triggers of traumatic memories, exaggerated startle response, nightmares, persistently negative mood, difficulty relating to others, problems in social and occupational relationships, irritability, [and] avoidance of stress." Id. Under ADD symptoms, Dr. Lane noted "difficulty concentrating, staying on task, meeting deadlines, [and] avoidance of tasks requiring sustained attention." Id.

On July 23, 2015, Dr. Lane stated that Plaintiff's "symptoms remain consistent. [N]o changes noted." Id. at 465–67. On September 5, 2015, Dr. Lane noted "no changes observed." Id. at 461, 464.

On September 5, 2015, Dr. Lane filled out a form entitled "Mental Residual Functional Capacity Assessment." Id. at 458–60. Dr. Lane noted as "markedly limited" Plaintiff's ability to: maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance and be punctual, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and respond appropriately to changes in the work setting. Id. at 458–59. Dr. Lane also stated that Plaintiff's "level of functioning in terms of his ability to process information in a work capacity is not significantly impaired, however, due to his severe combat related PTSD, he is prone to [illegible] exacerbations of his PTSD symptoms,

especially at night, which would limit his ability to function in a work capacity, on the day following these exacerbations." Id. at 460.

Dr. Lane's September 19, 2015 notes state that Plaintiff has "ongoing severe" PTSD, "hypervigilance, easily triggered by sounds, [and] thoughts that remind him of his past experiences in the military," "daily feelings of being tense and on edge, with episodes of autonomic reactivity ie incr heart rate, incr breathing rate, sweating, feeling flushed etc." Id. at 515, 517. Dr. Lane stated that Plaintiff "struggles to even leave the house for days at a time, when he is heavily triggered by memories of traumatic events endured during his military service," and reported "severe nightmares" at least six days per week, if not daily, which "impacts [Plaintiff's] overall sleep, avg 4–5h/night, with some sleepless nights intermittently as well." Id.

On September 19, 2015, Dr. Lane filled out a "Provider Medical Assessment" form and stated that Plaintiff meets medical Listing 12.06 for anxiety-related disorders. Id. at 519. He noted that Plaintiff suffers from a generalized persistent anxiety accompanied by the following symptoms: motor tension, autonomic hyperactivity, apprehensive expectation, vigilance and scanning; present irrational fear of a specific object, activity or situation which results in a compelling desire to avoid the dreaded object, activity or situation; and recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress. Id. at 520. Under "Rating of Functional Limitations," B Criteria of the listings, Dr. Lane noted that Plaintiff had "marked" functional limitation of the following: restriction of activities of daily living, difficulties in maintaining social functioning, concentration, persistence, or pace. Id. at 521. Dr. Lane also indicated that Plaintiff had "four or more" episodes of decompensation, each of

extended duration.  Id.  Dr. Lane concluded that Plaintiff "meets criteria for both A+B," as well as "Category [C]-2."[4]  Id. at 522.

**Dr. Morris**

On June 8, 2015, Heather Morris, a consultative clinical psychologist, evaluated Plaintiff and completed a PTSD Disability Benefits Questionnaire.  Id. at 450–55.  Dr. Morris stated that Plaintiff has PTSD and Attention Deficit Hyperactivity Disorder ("ADHD"), and that Plaintiff's ADHD manifests in "difficulty concentrating, staying on task, meeting deadlines, [and] avoidance of tasks requiring sustained attention."  Id. at 450–51.  She further stated that Plaintiff has a history of panic attacks, sleep disturbance, avoidance of triggers or traumatic memories, exaggerated startle response, nightmares, persistent negative mood, difficulty relating to others, problems in social/occupational relationships, irritability, and avoidance of stress.  Id. at 452. Dr. Morris also noted that Plaintiff's "ADHD as a result of PTSD has the greatest impact on employability due to difficulties with concentration, task completion, and avoidance of tasks requiring sustained concentration."  Id.  Dr. Morris noted that Plaintiff suffered from the following symptoms: depressed mood, anxiety, suspiciousness, panic attacks occurring more than once a week, chronic sleep impairment, mild memory loss, disturbances of motivation and mood, difficulty in establishing and maintaining effective work and social relationships and in adapting to stressful circumstances, including work or work like setting, and inability to establish and maintain effective relationships.  Id. at 454.  Dr. Morris concluded that Plaintiff was capable of

---

[4]  Pursuant to Listing 12.06, "[t]he required level of severity for [anxiety related] disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied." Radomski v. Colvin, 2013 WL 12100711, at *4 (S.D. Cal. Jul. 12, 2013) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.06).

managing his financial affairs, but had "[o]ccupational and social impairment with deficiencies in most areas, such as work, school, family relations, judgment, thinking and/or mood." Id. at 451, 455.

**Dr. Glassman**

On June 12, 2014, Dr. Glassman, a consultative examining psychiatrist, completed a psychiatric evaluation of Plaintiff. Id. at 363–67. Dr. Glassman stated that Plaintiff was granted VA disability due to PTSD and asthma, served in the Air Force since he was eighteen, and worked for the Predator Program helping with weather predictions for those operating Predator drone aircraft. Id. at 363. He stated that Plaintiff was exposed to the war environment on live video feeds and "witnessed violent episodes from missiles and bombs." Id. at 364. He noted that Plaintiff reported that on some days, he cannot leave the house due to his mood, lack of sleep, and being "down and preoccupied"; that on some days he could work, but "would not be able to be consistent"; and that on most days he cannot work because he gets overwhelmed and does "not follow through on things." Id.

Dr. Glassman noted that Plaintiff had the following ongoing PTSD symptoms: "very bad nightmares . . . although Prazosin has helped," intrusive, disturbing memories and images, frequent hyper vigilance, edginess, irritability, avoidance of weather reports, and being around people. Id. He stated that Plaintiff does not sleep well, has low energy and motivation, frequently procrastinates, and gets overwhelmed easily. Id. Dr. Glassman also noted that Plaintiff saw a psychiatrist, but had not been in therapy because "[i]t is difficult for [him] to talk about it." Id.

With respect to Plaintiff's activities of daily living, Dr. Glassman noted that Plaintiff does not sleep well due to nightmares and difficulties with falling and staying asleep. Id. at 365. He

23

further noted that Plaintiff does his grooming, but does not do the household chores regularly, and often reads technical material, which helps Plaintiff to "get his mind off the memories." Id.

Dr. Glassman stated that during the exam, Plaintiff was calm, cooperative, polite, respectful, alert and oriented, but his eye contact was "somewhat decreased," mood was "consistently significantly dysphoric," Plaintiff appeared preoccupied, irritable, and "detached," and it was "difficult to connect with [Plaintiff] and establish rapport." Id. at 365–66. Dr. Glassman stated that Plaintiff developed PTSD and "probable Depression" related to Plaintiff's military service in the Air Force. Id. at 366. Dr. Glassman's diagnoses were: Axis I–PTSD, Dysthymic Disorder; Axis II & III–n/a, Axis IV–no major current stressors, Axis V–GAF score of 55. Id.

Dr. Glassman found that Plaintiff is capable of behaving in a socially appropriate manner, understanding, and following simple instructions, and is moderately impaired in his capacity to "get along adequately with others," maintain concentration, persistence and pace, and to adapt to changes and stressors in a workplace setting. Id. Dr. Glassman further opined that psychotherapeutic treatment could help decrease Plaintiff's symptoms and improve functioning. Id. Dr. Glassman concluded that "from a psychiatrist perspective, [Plaintiff] has a significant impairment in his capacity to function in workplace setting, du[e] to his PTSD and Depression." Id.

## 2. Relevant Law

The opinion of a treating doctor generally should be given more weight than opinions of doctors who do not treat the claimant. See Turner v. Comm'r of Soc. Sec., 613 F.3d 1217, 1222 (9th Cir. 2010) (Lester v. Chater, 81 F.3d 821, 830–31 (9th Cir. 1995)). If the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing"

reasons supported by substantial evidence in the record. Id. Even when the treating doctor's opinion is contradicted by the opinion of another doctor, the ALJ may properly reject the treating doctor's opinion only by providing "specific and legitimate reasons" supported by substantial evidence in the record for doing so. Id. This can be done by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating [her] interpretation thereof, and making findings." Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008) (citing Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)). "The ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007) (quoting Embrey v. Bowen, 849 F.2d 418, 421–22 (9th Cir. 1988)). "The opinion of a non-examining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician; such an opinion may serve as substantial evidence only when it is consistent with and supported by other independent evidence in the record." Townsend v. Colvin, 2013 WL 4501476, at *6 (C.D. Cal. Aug. 22, 2013) (internal quotations omitted) (citing Lester, 81 F.3d at 830–31; Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999)).

> If a treating doctor's opinion is not afforded controlling weight,
>
> the ALJ must consider the "length of the treatment relationship and the frequency of examination" as well as the "nature and extent of the treatment relationship" . . . . In addition, the ALJ must still consider the other relevant factors such as "the amount of relevant evidence that supports the opinion and the quality of the explanation provided" and "the consistency of the medical opinion with the record as a whole."

West v. Colvin, 2015 WL 4935491, at *8 (D. Or. Aug. 18, 2015) (quoting Orn, 495 F.3d at 631; 20 C.F.R. §§ 416.927(c); 404.1527(c)).

### 3. Analysis

On September 5, 2015, Dr. Lane filled out a "Mental Residual Functional Capacity Assessment" form, and on September 19, 2015, provided medical source statements, concluding that Plaintiff had significant mental imparments, which met medical Listing 12.06. Id. at 458–60, 519–20. The ALJ assigned "less weight" to the above opinions finding that they are "not supported by the record." Id. at 35. The ALJ reasoned that on May 3, 2014, Dr. Lane "noted that [Plaintiff] had no improvement since 2012," that Plaintiff's "treatment remained non-emergent and he was continued with counseling every one-to-two months and prescribed medications," and on September 5, 2015, "reported the claimant had good insight and judgment." Id. at 34–35.

The ALJ assigned "great weight" to the findings of non-examining, non-treating physician, Dr. McDevitt, reasoning as follows:

> Dr. McDevitt carefully reviewed the records and determined the claimant had a history of PTSD and ADHD (See Testimony), but was not precluded from non-public simple work.

> Dr. McDevitt testified that the claimant's subjective complaints in Exhibit 9F suggested he would have a total preclusion from work activity, but there was no solid evidence of disabling B criteria in the record and the claimant made no efforts to do any active work in the day (See testimony). In addition Dr. McDevitt felt the claimant's trauma was rather unusual from watching videos of combat (9F); and it was also unusual that he made no medical progress from 2011 through 2013 (*id.*).

> Based on these findings, Dr. McDevitt opined the claimant had moderate limitations in social interaction and concentration, as he had difficulties interacting with others and sleepiness might cause him to have trouble staying awake at work (See Testimony). Moreover, Dr. McDevitt stated that while the claimant certainly meets the V.A. criteria for disability, he did not have enough medical evidence to reach the standard set forth for disability by Social Security (*id.*). The findings of Dr. McDevitt are fully consistent with the record, and afforded great weight.

Id. at 35.

2       When the treating doctor's opinion is contradicted, the ALJ may reject the treating

3  doctor's opinion by providing "specific and legitimate reasons" supported by substantial evidence

4  in the record for doing so.  See Turner, 613 F.3d at 1222; Lester, 81 F.3d at 830–31.  The

5  medical records provided by Dr. Lane contain numerous entries reporting that Plaintiff's PTSD

6  and ADD symptoms were ongoing and severe.  See AR at 377 (May 3, 2014 note documenting

7  anxiety, depressed mood, difficulty concentrating, sleep disturbances, excessive worry, fatigue,

8  racing thoughts, and restlessness, weekly panic attacks, and memory and judgment

9  impairments); 380 (May 24, 2013 note documenting "severe chronic ptsd [which] impact[ed]

10  functioning"); 479 (October 25, 2014 report of "ongoing struggles with hypervigilance, reliving,

11  reexperiencing [symptoms] of past traumas," noting that Plaintiff's symptoms were "very

12  debilitating," and that on many days, they prevented Plaintiff from leaving the house); 476

13  (January 17, 2015 report of "ongoing severe hypervigilance, reliving and nightmares");  468

14  (June 18, 2015 note of "[t]otal occupational and social impairment due to intermittent inability

15  to perform activities of daily living," also listing "panic attacks, sleep disturbance, avoidance of

16  triggers of traumatic memories, exaggerated startle response, nightmares, persistently negative

17  mood, difficulty relating to others, problems in social and occupational relationships, irritability,

18  [and] avoidance of stress"); 515, 517 (September 19, 2015 note of "ongoing severe" PTSD,

19  "hypervigilance, easily triggered by sounds, [and] thoughts," "daily feelings of being tense and

20  on edge, with episodes of autonomic reactivity," "struggles to even leave the house for days at

21  a time," "severe nightmares" at least six days per week, and sleep of only 4–5hours/night).  The

22  record also shows that Plaintiff was prescribed medications, which included a Schedule II

23  narcotic, anti-depressant, and alpha blocker, that Plaintiff was compliant with medications, but

showed minimal improvement.  See id. at 379–83, 463–64, 466–67, 470–72, 474–75, 479, 482–84, 515–17.

Dr. Lane's findings are consistent with the VA's finding that Plaintiff is 100% disabled due to PTSD, and with the findings of other examining physicians.  See id. at 473 (containing Dr. Lane's May 22, 2015 statement that he reviewed the VA findings of 100% disability effective May 6, 2014, due to Plaintiff's PTSD, agreed with the findings, and that the findings "still appl[ied]"); 451–52 (Dr. Morris's conclusion that Plaintiff suffers from "[o]ccupational and social impairment with deficiencies in most areas, such as work, school, family relations, judgment, thinking and/or mood," and that  his "employability [is negatively impacted by] difficulties with concentration, task completion, and avoidance of tasks requiring sustained concentration"); 366 (Dr. Glassman's conclusion that "from a psychiatrist perspective, [Plaintiff] has a significant impairment in his capacity to function in workplace setting, du[e] to his PTSD and Depression."). In addition, as discussed in detail below, neither Plaintiff's testimony nor any other evidence supports the ALJ's conclusion regarding Plaintiff's capabilities.  See infra Sections B and C; see also White, 2014 WL 4187823, at *4 (finding error where the ALJ misstated the record and ignored contradictory evidence).

Further, because Dr. McDevitt is a non-examining doctor, the ALJ must demonstrate that his opinion was supported by other independent evidence in the record.  Turner, 613 F. 3d at 1222.  The ALJ has failed to do so.  The Court initially notes that Dr. McDevitt stated during the administrative hearing that the last exhibit he had/reviewed was "9F" and that he was then given five to ten minutes to review Exhibits 10E–16F, which consist of 162 pages.  Id. at 61–62. Plaintiff argues that such brief review of his voluminous medical records was not sufficient, as reflected by Dr. McDevitt's statements "I'm not quite sure", "It is very, very unusual", "I'm not

quite sure all of the nuances of that" [Pl.'s Reply at 14 (citing AR at 68)], and the Court agrees.

Dr. McDevitt testified that Plaintiff's "trauma is rather unusual.  Somewhat—and I'm not quite

sure.  It is very, very unusual.  And I'd have to have some—if he was traumatized by watching

videos of combat."  AR at 68.  Dr. McDevitt further stated that "the issue with the 9F[5] was a

considerable trauma and some difficulty there.  I'm not quite sure all the nuances of that."  Id.

He also testified as follows: "I think it's very [inedible].  I think [Plaintiff] certainly meets the

VA's criteria, I'm sure, but *I can't see enough in this record* to meet the Social Security disability

standards, your honor."  Id. at 69 (emphasis added).

As such, Dr. McDevitt acknowledged that Plaintiff meets the VA's disability criteria.  See

id.  Notably, Dr. McDevitt testified that he "c[ould] *not see* enough in [Plaintiff's] record," as

opposed to testifying that the record *did not contain* evidence to support a finding that Plaintiff

meets the Social Security disability standards.  Contrary to the ALJ's assertion, Dr. McDevitt did

not "carefully review[] the records" in this case.  See id.; see also id. at 35.  Additionally, Dr.

McDevitt provided very limited rationale for his opinion and relied on facts preceding the period

of disability.  See e.g. AR at 68–69 (containing Dr. McDevitt's testimony that he was "troubled"

by lack of improvement in Plaintiff's condition in 2011 and 2012).  The ALJ therefore improperly

assigned "great weight" to Dr. McDevitt's  opinion.  See Herron v. Astrue, 407 F. App'x. 139 (9th

Cir. 2010) (finding that the ALJ improperly gave "great weight" to non-treating consultant's

---

[5]    The Court notes that Exhibit 9F contains Inspector General's Complaints Resolution documentation from the Department of Air Force, which addresses Plaintiff's complaint alleging reprisals from his supervisor.  Id. at 393–441.  Although the ALJ stated that "Dr. McDevitt testified that the claimant's subjective complaints in Exhibit 9F suggested he would have a total preclusion from work activity," the exhibit contains no reports from Plaintiff concerning his "subjective symptoms."  See id.; see also id. at 35.

opinion, where the "consultant did not review substantial portion of relevant medical evidence, and failed to give any valid or persuasive reasons for discounting VA disability ratings determination, which concluded that claimant was 70% disabled.").

Finally, the ALJ did not consider the "length of the treatment relationship" between Dr. Lane and Plaintiff, the frequency of the examinations, and the medical evidence that supports Dr. Lane's opinion.  See West, 2015 WL 4935491, at *8; Pierce v. Colvin, 2014 WL 2159388, at *2 (C.D. Cal. May 23, 2014) (stating that "[e]ven when not entitled to controlling weight, 'treating source medical opinions are still entitled to deference and must be weighed' in light of (1) the length of the treatment relationship; (2) the frequency of examination; (3) the nature and extent of the treatment relationship; (4) the supportability of the diagnosis; (5) consistency with other evidence in the record; and (6) the area of specialization.") (citing Edlund v. Massanari, 253 F.3d 1152, 1157 n.6 (9th Cir. 2001)).  Accordingly, the Court concludes that the ALJ did not provide "specific and legitimate reasons that are supported by substantial evidence in the record" for rejecting Dr. Lane's opinion, and finds that the ALJ erred in doing so.  See Lester 81 F.3d at 830–31.

## B.    Global Assessment of Functioning ("GAF") Scores

Plaintiff argues that the ALJ improperly discounted his low GAF scores.  See Pl.'s Mot. at 9; Pl.'s Reply at 14–15.  Plaintiff claims that the ALJ gave less weight to low GAF scores, but relied on the higher scores, and thus improperly "cherry-picked evidence" to support his decision.  See id.  Defendant maintains that GAF scores do not directly correlate to the requirements of the Listings for a finding of disability, and are neither determinative nor relevant in establishing the severity of a mental impairment.  Def.'s Mot. at 12–13.  Defendant further claims that Plaintiff's lower GAF scores "appeared inconsistent with mental status examination

and conservative treatment," and that there is no evidence suggesting that the GAF scores impacted the ALJ's assessment of Plaintiff's RFC or were determinative of the case outcome.  <u>Id.</u> at 13.

The ALJ acknowledged that Plaintiff was found to be unfit for his military job as a combat weather officer and meteorologist, or for deployment, but stated that Plaintiff's GAF scores of 60 and 65 indicated "no more than mild-to-moderate mental symptoms."  AR at 34.  The ALJ further stated the following:

> [t]he undersigned has read and *gives less weight to any low GAF scores throughout the claimant's record, including, but not limited to a GAF score of 45* (6F, p. 5; 13F, p. 1; 15F, p. 1).  GAF scores are subjectively assessed scores that reveal only snapshots of impaired and improved behavior.  In particular, the day the claimant was assigned a GAF score of 45, he had an anxious mood and flat affect, but an otherwise intact mental status exam; and he was maintained on a conservative treatment plan of counseling every one-to-two months and medication (6F, p. 5).  The undersigned gives more weight to the objective details and chronology of the record, which more accurately describe the claimant's impairments and limitations.

<u>Id.</u> at 35 (emphasis added).

The GAF Scale provides a measure for an individual's overall level of psychological, social, and occupational functioning.  <u>Demko v. Comm'r of Soc. Sec.</u>, 2016 WL 1072837, at *7 (S.D. Cal. Feb. 11, 2016) (citing <u>Vanbibber v. Carolyn</u>, 2014 WL 29665, at *1 (W.D. Wash. Jan. 3, 2014); Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 32–34 (4th ed. 2000)).  A GAF score of "41–50 indicates 'serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).'"  <u>Demko</u>, 2016 WL 1072837, at *7 (quoting <u>Michaels v. Colvin</u>, 2014 WL 37744, at *1 (C.D. Cal. Jan. 6, 2014); American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, 32 (4th ed.)).

The totality of the medical evidence in this case does not support the ALJ's reasoning and decision to assign less weight to Plaintiff's low GAF scores. <u>See</u> AR at 35. Plaintiff's GAF scores have been documented by numerous medical providers and have steadily and drastically declined from 70 to 45. <u>See id.</u> at 494, 504 (Dr. Leong's May 15, 2011 notes listing Plaintiff's GAF score of "65"); 500 (Dr. Bhat's August 15, 2011 notes listing the score of "61, possibly lower"); 316 (Dr. Hansel's April 7, 2012 notes listing the score of "65"); 283, 350 (Marat Zanov's March 18, 2013 notes listing the score of "61"); 314 (Dr. Abejuela's May 2, 2013 notes listing the score of "60"); 274 (Dr. Dang's May 8, 2013 notes listing the scope of "65," also stating that the "highest GAF past year [was] 70"); 272 (Dr. Dang's June 10, 2013 addendum noting that Plaintiff's GAF score "changed from 65 (previous evaluation) to 60"); 366 (Dr. Glassman's June 12, 2014 notes listing the score of "55"), 378, 380, 383, 463, 467, 471, 475, 477, 480–81, 484, 515 (Dr. Lane's May 3, 2014 notes assessing the score of "45" and listing the same score as Plaintiff's "current" GAF score on the following dates: May 24, 2013; August 8 and October 25, 2014; January 17, June 16, July 23, September 5, and September 19, 2015). Plaintiff's medical records establish that he was assessed the GAF score of 45 on May 4, 2014, and that the score has not changed for almost a year-and-a-half preceding the ALJ's hearing. <u>See id.</u> at 378, 380, 383, 463, 467, 471, 475, 477, 480–81, 484, 515. As such, the above records listed in chronological order contradict the ALJ's statement that he gave more weight to the "objective details and *chronology* of the record." <u>Id.</u> at 35 (emphasis added).

Further, on September 19, 2015, merely weeks before Plaintiff's October 7, 2015 administrative hearing, Plaintiff's treating physician described Plaintiff's PTSD as "severe," with hypervigilance, easily triggered by sounds and thoughts, daily feelings of being tense and on edge, increased heart and breathing rate, sweating, and feeling flushed, "severe nightmares at

least 6 out of 7 days of the week, if not daily," an average 4–5 hours of sleep per night, and "struggles to even leave the house for days at a time." Id. at 515. The ALJ therefore did not consider the consistency of the GAF scores with all treatment comments and diagnoses, and improperly understated the significance of Plaintiff's lower scores. See id.; see also Mooney v. Astrue, 374 F. App'x 705, 707 (9th Cir. 2010) (noting that a GAF score ranging from 43 to 49 fell within the "serious symptoms" range); Demko, 2016 WL 1072837, at *7 (a GAF score of "41–50 indicates 'serious symptoms . . . OR any serious impairment in social, occupational, or school functioning. . . .'" ). As such, the ALJ erred by assigning reduced weight to Plaintiff's low GAF scores.

### C.  **Plaintiff's Credibility**

Plaintiff alleges the ALJ erred in assessing Plaintiff's credibility. See Pl.'s Mot. at 9–12; Pl.'s Reply at 15–17. Specifically, Plaintiff contends that the ALJ failed to set forth clear and convincing reasons supported by the record to find Plaintiff less than fully credible. See Pl.'s Mot. at 11–12; Pl.'s Reply at 17. Defendant asserts that the ALJ properly found Plaintiff's testimony not fully credible. Def.'s Mot. at 13–15.

The Ninth Circuit has established a two-part test for evaluating a claimant's subjective symptoms. See Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." Id. (citation and internal quotation marks omitted). The claimant, however, need not prove that the impairment reasonably could be expected to produce the alleged degree of pain or other symptoms; the claimant need only prove that the impairment reasonably could be expected to produce some degree of pain or other symptom. Id. If the claimant satisfies the

first element and there is no evidence of malingering, then the ALJ "can [only] reject the claimant's testimony about the severity of her symptoms . . . by offering specific, clear and convincing reasons for doing so." Id. (citation and internal quotation marks omitted). "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." Reddick, 157 F.3d at 722 (quoting Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995)). The ALJ's findings must be "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit [Plaintiff's] testimony." Thomas v. Barnhart, 278 F.3d 947, 958 (9th Cir. 2002).

When weighing the claimant's testimony, "an ALJ may consider . . . reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." Orn, 495 F.3d at 636 (internal quotation marks and citation omitted). An ALJ also may consider the claimant's work record and testimony from doctors and third parties regarding the "nature, severity, and effect of the symptoms" of which the claimant complains. Thomas, 278 F.3d at 958–59; see also 20 C.F.R. § 404.1529(c). If the ALJ's finding is supported by substantial evidence, the court may not second-guess his or her decision. See Thomas, 278 F.3d at 959; Carmickle v. Comm'r of Soc. Sec. Admin., 533 F.3d 1155, 1163 (9th Cir. 2008) (where the ALJ's credibility assessment is supported by substantial evidence, it will not be disturbed even where some of the reasons for discrediting a claimant's testimony were improper).

Neither party contests the ALJ's determination that Plaintiff has the following impairments: "posttraumatic stress disorder with associated ADHD and sleep issues." AR at 30; see also Pl.'s Mot.; Pl.'s Reply; Def.'s Mot. Because the ALJ concluded that Plaintiff's "medically

determinable impartments could reasonably be expected to cause the alleged symptoms," a finding which is not contested by either party, the first prong of the ALJ's inquiry regarding Plaintiff's subjective symptoms is satisfied.  See AR at 33; see also Lingerfelter, 504 F.3d at 1036; Pl.'s Mot.; Pl.'s Reply; Def.'s Mot.  Further, neither party alleges that the ALJ found that Plaintiff was malingering.  See Pl.'s Mot.; Pl.'s Reply; Def.'s Mot.  As a result, the Court must determine whether the ALJ provided clear and convincing reasons for discounting Plaintiff's subjective claims regarding his symptoms.  See Lingenfelter, 504 F.3d at 1036.

The ALJ found Plaintiff "not fully credible" reasoning as follows:

> While the claimant's subjective complaints support [that] he has moderate mental limitations, there is inconsistency in the record regarding no progress with post-traumatic stress disorder and the claimant's ability to do daily activities, including being able to fully prepare for his hearing and his extensive detailed participation at the hearing.  He has also only had *en* [sic] counseling visits in a year.
>
> The claimant also testified that his asthma was not too bad (See Testimony).
>
> Moreover, the claimant acknowledged he was able to live by himself and without anyone to help him; he was able to drive, three times a week; and he also did his own laundry and prepared his own meals (See Testimony).  The claimant's ability to participate in such activities undermined the credibility of his allegations of disabling functional limitations.  Some of the physical and mental abilities and social interactions required in order to perform these activities are the same as those necessary for obtaining and maintaining employment.

AR at 32–33 (emphasis added).  Plaintiff challenges all of the reasons provided by the ALJ in finding him not fully credible.  See Pl.'s Mot. at 9–12; Pl.'s Reply at 15–17.  The Court will consider Plaintiff's challenges below.

### 1. Plaintiff's Activities of Daily Living

Plaintiff argues that the ALJ erred in finding that Plaintiff's allegations of debilitation were inconsistent with his activities of daily living, and claims that such activities do not "meet the threshold for transferable work skills" because they "are performed on a limited, health

35

permitting basis." Pl.'s Mot. at 10–11. In determining a plaintiff's credibility, an ALJ may consider whether a plaintiff's daily activities are consistent with the asserted symptoms. See Thomas, 278 F.3d at 958–59 (citation omitted). While the fact that a plaintiff can participate in various daily activities does not necessarily detract from the plaintiff's credibility as to his specific limitations or overall disability, "a negative inference is permissible where the activities contradict the other testimony of the claimant, or where the activities are of a nature and extent to reflect transferable work skills." Elizondo v. Astrue, 2010 WL 3432261, at *5 (E.D. Cal. Aug. 31, 2010). "Daily activities support an adverse credibility finding if a claimant is able to spend a substantial part of her day engaged in pursuits involving the performance of physical functions or skills that are transferable to a work setting." Id. (citing Orn, 495 F.3d at 639; Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999); Thomas, 278 F.3d at 959). "A claimant's performance of chores such as preparing meals, cleaning house, doing laundry, shopping, occasional childcare, and interacting with others has been considered sufficient to support an adverse credibility finding when performed for a substantial portion of the day." Elizondo, 2010 WL 3432261, at *5 (citing Stubbs–Danielson v. Astrue, 539 F.3d 1169, 1175 (9th Cir. 2008); Burch v. Barnhart, 400 F.3d 676, 680–81 (9th Cir. 2005); Thomas, 278 F.3d at 959; Morgan, 169 F.3d at 600; Curry v. Sullivan, 925 F.2d 1127, 1130 (9th Cir. 1990)).

Here, Plaintiff testified that he lives by himself, does his laundry, buys groceries, drives three times a week, but prefers to avoid people and most of the time stays home, that he watches TV, reads, eats "pre-prepared meals," and very rarely cooks. AR at 60, 64. Plaintiff also testified that he "ha[s] a hard time sleeping," has nightmares at least six times a week, sleeps five to six hours on a "good day," and three hours on a regular day, has "trouble completing tasks," gets overwhelmed easily, and tends to put things off for as long as he can.

1    Id. at 59, 63.

2          Other than citing Plaintiff's testimony that he lives by himself, drives three times per

3    week, does laundry, and prepares meals, the ALJ neither described specific activities that Plaintiff

4    engaged in that would bear on his ability to engage in the activities of the workplace, nor

5    discussed whether Plaintiff engaged in those activities for a substantial part of the day and on a

6    daily basis.  See id. at 32–33; see also Reddick, 157 F.3d at 722 (holding that sporadic activities

7    followed by periods of rest are not inconsistent with subjective complaints of severe pain).

8    Without such additional facts, Plaintiff's ability to care for his personal needs does not undermine

9    his testimony that he cannot work, and is not a clear and convincing reason for finding Plaintiff

10   less than fully credible.  See Vertigan v. Halter, 260 F.3d 1044, 1050 (9th Cir. 2001) ("the mere

11   fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a

12   car, or limited walking for exercise, does not in any way detract from her credibility as to her

13   overall disability."); Heine-O'Brien v. Astrue, 359 F. App'x 699, 701 (9th Cir. 2009) (citing Orn,

14   495 F.3d at 639) (the ability to care for personal needs does not necessarily indicate the ability

15   to perform gainful employment); Garrison v. Colvin, 759 F.3d 995, 1016 (9th Cir. 2014) (quoting

16   Reddick, 157 F.3d at 722) ("[r]ecognizing that 'disability claimants should not be penalized for

17   attempting to lead normal lives in the face of their limitations,' we have held that '[o]nly if [her]

18   level of activity were inconsistent with [a claimant's] claimed limitations would these activities

19   have any bearing on [her] credibility.") (alterations in original).

20         Further, Plaintiff's medical care providers have consistently noted that Plaintiff's daily

21   activities were significantly restricted.  See AR at 311–12, 315 (Dr. Abejuela's May 29, 2013 note

22   that Plaintiff reported that his "symptoms affect total daily functioning," that he sleeps for only

23   a few hours, has nightmares, and prefers to be alone); 363–64, 367 (Dr. Glassman's June 12,

2014 note that Plaintiff reported that on some days, he cannot leave the house due to his mood, lack of sleep, and being "[d]own and preoccupied"); 479, 481 (Dr. Lane's October 25, 2014 note that Plaintiff is frequently "impacted by his ptsd [symptoms] to where it makes it difficult to leave the house at times, due to the hypervigilance"); 468 (Dr. Lane's June 18, 2015 statement that Plaintiff has "[t]otal occupational and social impairment due to intermittent inability to perform activities of daily living."); 515, 517 (Dr. Lane's September 19, 2015 note stating that "during periods of severe triggering, [Plaintiff] struggles to even leave the house for days at a time"). Additionally, a "Function Report" filled out by a third party Donna Orozco on April 13, 2014, also notes that Plaintiff has "[d]ifficulty getting out of bed," "[n]o motivation to leave the house," "[i]s unable to complete tasks," "[d]oesn't feel comfortable being around other people for any periods of time," "[f]eels paranoid in most social settings," "[g]enerally stays at home," shops for food and clothing, about 20 minutes per week, buys prepared food, does laundry, but that chores take Plaintiff a long period of time to complete because he "sits distracted & loses focus [and] motivation." Id. at 190–94. The above reports also are consistent with the "Disability Report" filled out by Plaintiff on April 14, 2014, in which he stated that he lives alone, "generally stay[s] home," eats frozen or fast food, and frequently neglects personal needs due to lack of sleep and motivation loss. Id. at 213–17, 221.

Additionally, with respect to Plaintiff's reading, Dr. Glassman noted that Plaintiff reported frequently reading technical material to "get his mind off the memories [that trigger his symptoms]." Id. at 365. With respect to television watching, the ALJ did not ask Plaintiff, and Plaintiff did not further testify about the activity. See id. at 46–80. As such, Plaintiff's ability to read and watch television does not undermine his credibility. See Dunn v. Astrue, 2011 WL 6259965, at *3 (N.D. Cal. Dec. 15, 2011) (stating that it was unclear that plaintiff's daily

activities, including cooking, reading, and watching television, "necessarily involved the performance of physical functions transferable to a work setting"); Belcher v. Astrue, 2010 WL 2353524, at *16 (E.D. Cal. June 9, 2010) (stating that "reading, watching television and using the computer . . . bear no relationship to the activities of the workplace") (citing Orn, 495 F.3d 625 at 639 (finding that reading and watching television "are activities that are so undemanding that they cannot be said to bear a meaningful relationship to the activities of the workplace.")).

Accordingly, the ALJ failed to provide the requisite clear and convincing reasons for finding Plaintiff not fully credible based on Plaintiff's daily activities. The ALJ also failed to establish that Plaintiff's daily activities are transferable to a work setting and are performed for a substantial part of the day and on a daily basis. See White v. Colvin, 2014 WL 4187823, at *7 (C.D. Cal. Aug. 21, 2014) (ALJ must "specify how plaintiff's ability to perform such tasks would translate into an ability to perform gainful employment."). The Court therefore disregards this reason for discounting Plaintiff's credibility.

**2. ALJ's Other Stated Reasons for Finding Plaintiff not Fully Credible**

In determining Plaintiff's credibility, the ALJ also stated that Plaintiff "testified that his asthma was not too bad." AR at 33. During the administrative hearing, Plaintiff stated that his asthma "[g]enerally [is] not too bad," is "generally controlled," but if he gets sick, it "takes [him] a long time to recover," and when he is stressed or exercises, he has trouble breathing. Id. at 55–56. The ALJ fails to explain why Plaintiff's testimony regarding asthma undermines his credibility. See id. at 28–38.

The ALJ also discounted Plaintiff's credibility on the ground that Plaintiff "has only had en [sic] counseling visits in a year." Id. at 33 (emphasis added). Plaintiff testified that he was granted only "10 visits per year to see a psychiatrist." Id. at 65; see also id. at 63. The ALJ

again fails to explain how the fact that Plaintiff was authorized a limited number of visits undermines Plaintiff's credibility and/or complaints about his symptoms. See id. at 28–38.

Further, the ALJ cited Plaintiff's "ab[ility] to fully prepare for his hearing and his extensive detailed participation at the hearing" as an additional reason to discredit Plaintiff's credibility. Id. at 33. While an ALJ can include personal observations of a plaintiff during a hearing, a negative credibility determination based on those observations is proper only if it is supported by other evidence. See Garcia v. Astrue, 2013 WL 1797029, at *17 (S.D. Cal. Mar. 13, 2013) (citing Larsen v. Asture, 2011 WL 3359676, at *9 (E.D. Cal. Aug. 3, 2011); Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir. 1986)). Here, the ALJ failed to explain how Plaintiff's participation in the administrative hearing related to his PTSD and ADHD. Notably, Plaintiff's "extensive detailed participation" in the hearing was necessitated by the fact that he was not represented by an attorney. See AR at 46–80. Plaintiff testified that although he met with several attorneys, he was not "comfortable," ultimately concluded that no one would "take the time to know [his] situation as well as [he] know[s] it," and that he has "much anxiety over the whole process." Id. at 47–50. Plaintiff also testified that he is unable to "just trust people in general" [id. at 71] and has "good days–good weeks and bad weeks" [id. at 63]. Further, Plaintiff's medical records consistently note that he has anxiety, that his "capacity to get along adequately with others" is impaired, and that he has problems with social and occupational relationships. See id. at 314–15, 366, 469. As such, the objective medical evidence supports the symptoms alleged by Plaintiff and does not support the ALJ's credibility finding. See Kimzey v. Comm'r of Soc. Sec., 2011 WL 1230818, at *20 (E.D. Cal. Mar. 30, 2011) (finding that the ALJ's personal observations of plaintiff were not clear and convincing reasons supporting the adverse credibility determination where the ALJ "did not identify 'other' evidence that was consistent with his personal observation

and did not address how [p]laintiff's ability to participate in the hearing discredited [p]laintiff's evidence related to his claimed mental impairment, a claimed physical impairment or both."); Rojas v. Astrue, 2011 WL 2563178, at *7 (C.D. Cal. June 27, 2011) (finding that the ALJ erred by "discrediting plaintiff merely due to his attendance at and participation in his own hearing" and finding that the ALJ's reasoning was "akin to the so-called 'sit and squirm' test, in which an ALJ evaluates a plaintiff's credibility based on his or her demeanor at a hearing" and which the Ninth Circuit has disapproved of by noting that "[t]he fact that a claimant does not exhibit physical manifestations of [symptoms] at the hearing provides little, if any, support for the ALJ's ultimate conclusion that the claimant is not disabled or that his allegations . . . are not credible.") (quotations omitted). The Court concludes that none of the additional reasons provided by the ALJ constitute a clear and convincing basis for finding Plaintiff less than fully credible.

### D.    **ALJ's Answer to Plaintiff's Objections**

Plaintiff claims the ALJ committed a reversible error because he failed to respond to Plaintiff's two objections made at the administrative hearing, in violation of the Hearings, Appeals, and Litigation Manual, an internal Social Security Administration Policy Manual ("HALLEX"). See Pl.'s Mot. at 12; Pl.'s Reply at 17–18. Defendant argues that that HALLEX does not impose judicially enforceable duties on the ALJ or the Court, and that the ALJ did not err. Def.'s Mot. at 15–16.

The Ninth Circuit has held that the HALLEX is a Social Security Administration internal procedures manual and, as such, does not impose a judicially enforceable duty. See Clark v. Astrue, 529 F.3d 1211, 1216 (9th Cir. 2008) ("HALLEX is strictly an internal Agency manual, with no binding legal effect on the Administration or this court."); Moore v. Apfel, 216 F.3d 864, 869 (9th Cir. 2000) ("As HALLEX does not have the force and effect of law, it is not binding on the

Commissioner and we will not review allegations of noncompliance with the manual."). Accordingly, Plaintiff's argument that the ALJ committed a reversible error by failing to discharge duties under HALLEX is unavailing. See Jackson v. Colvin, 2014 WL 3735361, at *3 (E.D. Cal. Jul. 26, 2014) (rejecting plaintiff's argument that ALJ's alleged failure to discharge duties under HALLEX warranted reversal).

### E. **Conclusion**

The ALJ erred in disregarding the opinions of Plaintiff's treating physician, assigning reduced weight to Plaintiff's low GAF scores, and finding Plaintiff not fully credible. The Court therefore **RECOMMENDS** that Defendant's Cross-Motion for Summary Judgment with respect to Issue II be **DENIED**, and Plaintiff's Motion for Summary Judgment be **GRANTED**.

## VI. **Remand v. Reversal**

"The decision whether to remand for further proceedings or simply to award benefits is within the discretion of [the] court." McAllister v. Sullivan, 888 F.2d 599, 603 (9th Cir. 1989). "Remand for further administrative proceedings is appropriate if enhancement of the record would be useful." Benecke v. Barnhart, 379 F.3d 587, 593 (9th Cir. 2004) (emphasis omitted). On the other hand, if the record has been fully developed such that further administrative proceedings would serve no purpose, "the district court should remand for an immediate award of benefits." Id.

In this case, the ALJ erred by failing to provide adequate justification for assigning less weight to the VA's determination that Plaintiff is 100% disabled, to the opinions of Plaintiff's treating psychiatrist, Dr. Lane, and to Plaintiff's low GAF scores, and for finding Plaintiff not fully credible. It is unclear from the record whether there are adequate reasons to discount the identified opinions and findings, and whether Dr. McDevitt's opinion would change if he was

42

provided sufficient time to review the record, and whether he could then opine on specific and legitimate reasons for discounting the opinions and evidence. This Court therefore **RECOMMENDS REVERSING** the decision of the ALJ and **REMANDING** for further consideration to address the errors noted above. See Mooney, 374 F. App'x. at 707–08 (reversing and remanding the case, where the ALJ gave less weight to the VA's award of 100% service-connected disability, and where plaintiff's GAF scores ranged between 43–49; instructing the ALJ to "give great weight to [plaintiff's treating psychologist's] opinion, the VA GAF scores, and the VA disability award, unless the ALJ can articulate clear and convincing reasons supported by substantial evidence in the record for not doing so.").

## CONCLUSION

For the reasons set forth above, this Court **RECOMMENDS** that Plaintiff's Motion for Summary Judgment be **GRANTED** and Defendant's Cross-Motion for Remand be **DENIED** and that the decision of the ALJ be **REVERSED** and **REMANDED** for further consideration.

**IT IS HEREBY ORDERED** that any written objections to this Report and Recommendation must be filed with the Court and served on all parties no later than **June 30, 2017**. The document should be captioned "Objections to Report and Recommendation."

///

///

///

///

///

///

///

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **July 14, 2017**.  The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.  Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1157 (9th Cir. 1991).

**IT IS SO ORDERED**.

Dated:  6/15/2017

Hon. Barbara L. Major
United States Magistrate Judge

16cv1251-JLS (BLM)